UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
KAREN MASCARELLA PAPALIA,   :
              :  09 CV 9257 (NRB)
       Plaintiff,  :
              :
   -against-     :
              :
MILROSE CONSULTANTS, INC.,   :
              :
       Defendant.  :
-------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ............................................................................................ iii, iv

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL SUMMARY ................................................................................................. 3

A.   Ms. Papalia's Hire to Milrose and Promotion to Run Operations........................ 3

B.   Ms. Papalia Is Treated Less Favorably Than A Younger Male Hire .................... 4

C.   Milrose's President Makes a Series of Sex- and Age-Based Remarks In Connection
     With the Firm's Employment Practices Generally and Ms. Papalia In Particular ............ 4

D.   Ms. Papalia Attempts to Hire and Retain a Qualified "Number Two" ................. 6

E.   Ms. Papalia's Grand Jury Service and Resulting Hostile Work Environment.................. 6

F.   Milrose's Partners Learn of Ms. Papalia's Jury Letter and Decide to Demote Her ........... 8

G.   Age-Based Comments Made During Ms. Papalia's
     Demotion Evidence Discrimination ..................................................................... 8

H.   Ms. Papalia Is Replaced By One Younger Man, Then Another......................... 10

ARGUMENT ................................................................................................................ 11

I.   SUMMARY JUDGMENT SHOULD BE DENIED ON
     PLAINTIFF'S CLAIMS OF AGE AND SEX DISCRIMINATION............................ 11

     A.   Standard of Review .................................................................................... 11

     B.   Ms. Papalia Has Established a *Prima Facie* Case of Discrimination.................. 13

          1.   Ms. Papalia was replaced by younger men..................................... 14

          2.   Statements made by Milo and Chieco created a discriminatory
               atmosphere from which a reasonable juror may conclude that
               Ms. Papalia suffered illegal discrimination ..................................... 15

     C.   A Question of Fact Exists As to Whether the Stated Basis for
          Ms. Papalia's Demotion Was Pretextual ..................................................... 18

II.  SUMMARY JUDGMENT SHOULD BE DENIED ON
     PLAINTIFF'S CLAIM UNDER THE JSIA ......................................................... 21

CONCLUSION ........................................................................................................... 23

i

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

<u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456 (2d Cir.), <u>cert.</u> <u>denied</u>,
  122 S. Ct. 460 (2001)..........................................................................................14

<u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S. Ct. 1598 (1970) .............................12

<u>Ames v. Cartier, Inc.</u>, 193 F. Supp.2d 762 (S.D.N.Y. 2002)....................................12, 17

<u>Back v. Hastings</u>, 365 F.3d 107 (S.D.N.Y. 2004) .........................................................14

<u>Bickerstaff v. Vassar College</u>, 196 F.3d 435 (2d Cir. 1999 ........................................13

<u>Binder v. Long Island Lighting Co.</u>, 57 F.3d 193 (2d Cir. 1995)..................................18

<u>Brown v. Henderson</u>, 257 F.3d 246 (2d Cir. 2001) ...............................................12, 14

<u>Byrnie v. Town of Cromwell Bd. of Educ.</u>, 243 F.3d 93 (2d Cir. 2001) ...................12, 13, 19, 21

<u>Carlton v. Mystic Transportation, Inc.</u>, 202 F. 3d 129 (2d Cir. 2000) ...............13, 15, 16

<u>Conway v. Electro Switch Corp.</u>, 825 F.2d 593 (1st Cir. 1987) ...................................16

<u>Daly v. Presbyterian Hospital</u>, No. 98 Civ. 4253 (NRB), 2000 WL 8268
  (S.D.N.Y. Jan. 4, 2000) ...................................................................................12

<u>Danzer v. Norden Sys., Inc.</u>, 151 F.3d 50 (2d Cir. 1998)............................................18

<u>Dister v. Cont'l Group, Inc.</u>, 859 F.2d 1008 (2d Cir. 1988).....................................14, 18

<u>Evans v. Port Authority of New York and New Jersey</u>, 192 F. Supp.2d 247 (S.D.N.Y. 2002)........21

<u>Gallo v. Prudential Residential Servs., Ltd.</u>, 22 F.3d 1219 (2d Cir. 1994)................12, 13

<u>Garza v. Marine Transp. Lines, Inc.</u>, 861 F.2d 23 (2d Cir. 1988) ................................11

<u>Gordon v. N.Y.C. Bd. Of Educ.</u>, 232 F.3d 111 (2d Cir. 2000) .......................................18

<u>Heyne v. Caruso</u>, 69 F.3d 1475 (9th Cir. 1995) .........................................................15

<u>Holtz v. Rockefeller & Co., Inc.</u>, 258 F.3d 62 (2d Cir. 2001).......................................13

<u>James v. New York Racing Ass'n</u>, 233 F.3d 149 (2d Cir. 2000).....................................15

Jeffreys v. My Friend's Place, Inc., 719 F. Supp. 639 (M.D. Tenn. 1989)........................22

Leibowitz v. Cornell Univ., 584 F.3d 487 (2d Cir. 2009) ...........................................13

O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 116 S. Ct 1307 (1996)..............15

Patrick v. LeFevre, 745 F.2d 153 (2d Cir. 1984)........................................................12

Phillip v. ANR Freight Sys., Inc., 945 F.2d 1054 (8th Cir. 1991)...................................15

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)...................................................15

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct 2097 (2000)...............13, 21

Schreiber v. Worldco, LLC, 324 F. Supp.2d 512 (S.D.N.Y. 2004) ...............................16

Shea v. County of Rockland, 810 F.2d 27 (2d Cir. 1987)...........................................22

Stratton v. Department for the Aging for N.Y., 132 F.3d 869 (2d Cir. 1997)...............................18

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) .....................................18

Warren v. Halstead Indus., Inc., 802 F.2d 746 (4th Cir. 1986) .......................................16

Weiss v. JPMorgan Chase & Co., No. 08-0801-cv, 2009 WL 1585279 (2d Cir. 2009) ..............19

Wigginess Inc. v. Fruchtman, 482 F. Supp. 681 (S.D.N.Y. 1979),
    aff'd 628 F.2d 1346 (2d Cir. 1980) .......................................................17

Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376 (2d Cir. 2001) .................................15

Plaintiff, Karen Mascarella Papalia, submits this memorandum in opposition to the motion for summary judgment filed by Defendant, Milrose Consultants, Inc. ("Milrose").

## PRELIMINARY STATEMENT

Ms. Papalia spent ten years at Milrose rising through the ranks and fighting to be recognized as a professional who was just as valuable to the firm as more recent male hires. As Director (and later Executive Director) of Operations, she effectively ran the company along with Milrose's four male partners. It was clear, however, that Milrose's President viewed her as an oddity, conveying his surprise that an older woman such as herself would be so dedicated to her career. Similarly, it was clear that Milrose's partners regularly considered such impermissible factors as sex and age in making employment decisions in the years leading up to Ms. Papalia's demotion. A reasonable juror may thus readily conclude that Ms. Papalia's age and or sex were factors in Milrose's decision to demote her and to replace her with younger men.

For an 18-month period late in her tenure at Milrose, Ms. Papalia served one day a week on a federal grand jury. During that period, Ms. Papalia was subjected to a hostile work environment by Milrose's partners. Nothing she said or did made the situation any better. As a result, she documented the treatment she had suffered in a letter, which was placed in her personnel file but not shown to the partners. Shortly before her jury service ended, Ms. Papalia's production bonus was cut in half, and she was given a performance review that focused heavily on perceived performance issues allegedly caused by her jury service. Then, immediately prior to her demotion, the partners became aware of the letter Ms. Papalia had written concerning her treatment during jury service. But for the discovery of that letter, Ms. Papalia would not have been removed from her position, demoted and forced to leave her employment, which is evident from the statement made to her about the letter that Milrose's partners "cannot get past it."

Unfortunately, the trend today among defendant employers faced with discrimination claims is invariably to move for summary judgment, even where there exist obvious and innumerable genuine issues of material fact in dispute. The material facts in dispute here are abundant. They include:

• Whether comments such as Milrose needs "young, fresh professionals," "aren't you tired?" and "I thought you would jump at the chance to not work so hard" made by a decisionmaker at the time of Ms. Papalia's demotion reflect age-based animus.

• Whether the instruction given by Milrose's President not to hire "any more women in key positions," in conjunction with other such statements (including that Milrose needed to hire "a male within the age of 30 to 35" for a sales position), creates a discriminatory atmosphere sufficient from which to conclude that Milrose was motivated by age and sex in deciding to demote Ms. Papalia.

• Whether the fact that Ms. Papalia was replaced first by one, then another, younger male raises an inference of age and/or sex discrimination.

• Whether Milrose's decision to abandon a Director of Administration position after demoting Ms. Papalia to that position demonstrates that the need for such a position (which was proffered as a reason for Ms. Papalia's demotion) is pretextual.

• Whether the fact that Ms. Papalia's immediate successor (a younger male) was similarly unable to hire and retain a "number two" demonstrates that this proffered reason for Ms. Papalia's demotion is pretextual.

• Whether the fact that Ms. Papalia was demoted immediately following the discovery of her letter concerning her treatment during jury service demonstrates that the letter, and the jury service it references, was the "but for" cause of Milrose's decision to demote her.

2

These factual issues, as well as various others, must be decided by a jury, and summary judgment must therefore be denied.

## FACTUAL SUMMARY

**A.**    **Ms. Papalia's Hire to Milrose and Promotion to Run Operations**

Ms. Papalia was born on April 21, 1955 and is currently 56 years old.  (Papalia Tr. 5)[1]  In May 1999, at age 44, Ms. Papalia joined Milrose as the firm's Assistant Controller.  She was hired by Milrose's then-Controller, Salvatore Monello with whom she had worked at a prior employer, and did not interview with any of Milrose's partners.  (Id. at 12-13)  The two of them also handled the Human Resource function at Milrose.  (Id. at 19)

In early 2002, one of Milrose's partners, Domenic Chieco ("Chieco"), who is 12 years younger than Ms. Papalia, suggested that Ms. Papalia be promoted to run the Operations function, which had been an open position for some time.  (Id. at 24-25)  The position was ultimately developed to encompass both Operations and Human Resources, and Ms. Papalia was given the title of Director.  (Id. at 26)  At the time, Chieco described the position in an e-mail as **"den mother"** of the office.  (Ex. V)[2]  In a similar vein, when Nicolle Comeforo was hired as Milrose's HR Director reporting to Ms. Papalia, Chieco told Ms. Papalia that he believed Human Resources was **"a woman's job."**  (Papalia Tr. 67)

In June 2004, in connection with preparing a bonus program for the firm, Ms. Papalia proposed that she receive a salary increase and production bonus to bring her compensation in line with what she had learned was the average market level.  (Id. at 86; Ex. W)  As a result, Ms. Papalia began to receive a bonus of 0.25 percent of the firm's annual production.  (Papalia Tr. 88)

---

[1] A copy of Ms. Papalia's deposition transcript is included with Defendant's motion papers as Exhibit 1 to the Affirmation of Roger Briton.

[2] Cited exhibits are attached to the Affirmation of Christine A. Palmieri, dated May 12, 2011 ("Palmieri Aff.")

**B.**   **Ms. Papalia Is Treated Less Favorably Than A Younger Male Hire**

In 2006, in connection with the hiring of Joseph Bastone ("Bastone") as the firm's new Controller, Ms. Papalia again sought an increased compensation package and title.   This request stemmed from the fact that Bastone, who is 8 years younger than Ms. Papalia, was hired with a higher base salary ($190,000 to Ms. Papalia's $125,000) and certain benefits not provided to Ms. Papalia.   (Id. at 135)   Although some of Ms. Papalia's requests were granted (she received reimbursement for commuting expenses but not a spending allowance), the partners denied her request for the title of Vice President of Operations, instead changing her title to Executive Director.[3]   (Id. at 140-41)   Even that change was not granted readily; according to Chieco, "Karen wanted it, Karen pushed it, Karen wouldn't let it go.  We gave it to her." (Chieco Tr. 23)[4]   Also in connection with Bastone's hire, Ms. Papalia learned from Milrose's accountant, Andrew Presti, that he had been instructed to identify **"men in their mid-years, preferably Italian,"** for the Controller position by Milrose's President, Louis Milo ("Milo").   (Id. at 72-73)

**C.**   **Milrose's President Makes a Series of Sex- and Age-Based Remarks In Connection With the Firm's Employment Practices Generally and Ms. Papalia In Particular**

Although Ms. Papalia was one of four senior employees reporting directly to the partners,[5] Chieco notes that at one point "the entire company reported to Karen" (Chieco Tr. 20), and it was widely viewed that the firm was run by "the partners and Karen."  (Papalia Tr. 134) Despite her senior position, however, Ms. Papalia understood that Milo viewed her as the exception to his stated plan to brand the firm in the image of **"white men in suits"** and **"no gray hairs."**  (Id.

---

[3] The partners were Vice Presidents and thought it would be confusing to give Ms. Papalia the same title, yet they had no trouble giving a Vice President title to Bastone when he assumed responsibility for Operations last year. (Chieco Tr. 25, 152-53)

[4] Cited pages from the transcript of the deposition of Domenic Chieco are attached to the Palmieri Aff. at Exhibit A.

[5] The others were Bastone, the HR Director (then Nicolle Comeforo) and the IT Director (then Michael Keene).

at 64)  In addition to telling Ms. Papalia of his plan on multiple occasions[6], Milo wrote in a 2005 policy paper that the firm needed to **"hire a male within the age of 30 to 35 to assist us in client management and marketing."**  (Papalia Tr. 64; Ex. X)  In attempting to explain this statement for Milo, Chieco made clear that the intent was to discriminate in hiring for the illegal purpose of retaining clients:  "[A]s our clientele becomes older and grayer, newer people fill their slots and it makes sense to align them with people that they are comfortable with. … It is just the way business is in terms of maintaining relationships." (Chieco Tr. 190)

Milo told Ms. Papalia on several occasions that he thought she was "odd" for continuing to pursue her career at Milrose, since **"most women your age want a little job out on Long Island."**  (Papalia Tr. 46)  Milo also said to Ms. Papalia during various compensation discussions that the firm had to **"take care of men with families first."**  (Id. at 46, 51)  In 2008, the year prior to Ms. Papalia's demotion, Milo told one of her reports, Jaclyn DiRenzo, that Milrose had **"enough women in key positions"** and that he was **"not hiring any more women"** but instead **"needs men in these slots."**[7]  (Ex. Y)  Milo also told Ms. DiRenzo that one of the two women recently hired to sales positions – but not the men – would have to be let go.[8]  Ms. DiRenzo documented this conversation in a letter to Ms. Papalia and testified that the letter accurately reflects Milo's statements.  (Ex. Y; DiRenzo Tr. 41)[9]  Ms. DiRenzo had previously questioned whether

---

[6] Milo also said "if [retail store] Abercrombie and Fitch can profile, so can I," and asked Ms. Papalia and Ms. Comeforo to take pictures of job candidates so that he could view them before anyone was hired.  (Papalia Tr. 68-69)

[7] Ms. Papalia herself also heard Milo say on multiple occasions that the firm had enough women in key positions. (Papalia Tr. 65)

[8] Ms. Papalia had prepared with Ms. DiRenzo a termination notice for one of the women when that woman instead resigned to take another job.  (Papalia Tr. 61)

[9] Cited pages from the transcript of the deposition of Jaclyn DiRenzo are attached to the Palmieri Aff. at Exhibit D.

Milo had been motivated by gender in promoting a male colleague – but not her – to an Associate position.[10]  (DiRenzo Tr. 32-35)

**D.      Ms. Papalia Attempts to Hire and Retain a Qualified "Number Two"**

In 2005, Ms. Papalia was instructed to begin searching for someone to be her "number two," since her responsibilities and the firm's business had increased over the years.  Ms. Papalia worked with the firm's HR Directors to find qualified candidates.  Two people were hired to the position; one lasted approximately one year before resigning, and the other less than that. (Papalia Tr. 105-08)  A third person was hired to assume the position, but the partners and Ms. Papalia later agreed that she was not the right person for the job and transferred her to a different position.  (Id. at 109-11)  Ms. Papalia continued to work with HR to refine the job description for the number two position in order to attract and retain more suitable candidates.  (Id. at 112, 244)

**E.      Ms. Papalia's Grand Jury Service and Resulting Hostile Work Environment**

From March 2006 until September 2007, Ms. Papalia was required to serve one day a week on a federal grand jury in the District Court for the Eastern District of New York.  Although her salary was not negatively affected, the partners – particularly Milo – created a hostile work environment for Ms. Papalia, expressing anger that she was "paid for five days a week when she was only working four," and making her feel like she was taking advantage of the company. (Papalia Tr. 120; Milo Tr. 38)[11]  When Ms. Papalia tried to reassure Milo by letting him know that she was staying on top of things by working nights and weekends, his response was "I don't like it, I don't have to like it and that's all there is to it."  (Papalia Tr. 118)  Milo would also make flip comments when events were scheduled, saying to Ms. Papalia, "that's if you can make it because

---

[10] When Ms. Papalia discussed Ms. DiRenzo's concerns of sex discrimination with Milo, he responded that Ms. DiRenzo was just unhappy because she did not have a man in her life and wanted to have babies.  (Papalia Tr. 46) In his deposition, Milo sought to attribute that statement to Ms. Papalia.  (Milo Tr. 145)

[11] Cited pages from the transcript of the deposition of Louis Milo are attached to the Palmieri Aff. at Exhibit B.

you are on jury duty," or holding operational meetings on the one day a week (Tuesdays) that she was out of the office, saying "we will have the meeting when we want to have the meeting." (Id. at 122-25)  These and other comments – including that her jury duty was "killing everything in the office" – prompted some of Ms. Papalia's reports to ask her why the partners were angry with her. (Id. at 123, 162)  As a result, in February 2007, Ms. Papalia prepared a letter concerning the partners' harassment, writing that she found their day-to-day treatment of her to be negative and demoralizing. (Ex. Z)  She did not give a copy of the letter to Milrose's partners, since "[e]very time I talked to them it seemed like it got worse and not better." (Papalia Tr. 151)  Instead, the HR Director (then Ms. Comeforo) placed the letter in Ms. Papalia's personnel file. (Id. at 157-58)

In September 2007, just prior to the conclusion of Ms. Papalia's jury service, the partners prepared a year-end performance review in which Milo in particular focused his comments on what he perceived to be problems in operations due to Ms. Papalia's jury service (Ex. M).  In addition, Milo wrote that Ms. Papalia "was instructed to hire someone as good or better to assist her in management.  Did not follow direction." (Id.).  In fact, just two months earlier, Milo had recommended a family friend for the position, and she had been hired. (Exs. J, K)  Moreover, Chieco disagreed that Ms. Papalia's jury service was hurting her performance. (Chieco Tr. 41)

Shortly thereafter, in December 2007, Ms. Papalia's bonus eligibility percentage was cut in half, from 0.25 percent to 0.125 percent of project management revenue.  When Ms. Papalia questioned the reduction, Milo said "I don't know why we're still giving you that." (Papalia Tr. 195)  Chieco explained that the firm was "banding" directors (Id. at 197); however, Ms. Papalia was an executive director, not a director.  Also at the end of 2007, Ms. Papalia again requested to have her compensation package brought in line with that of Bastone.  Although their salaries were

equated, Bastone received greater commutation benefits than did Ms. Papalia, as well as a life insurance policy that was denied to her.  (Id. at 202)

**F.      Milrose's Partners Learn of Ms. Papalia's Jury Letter and Decide to Demote Her**

In September 2008, Milrose transitioned the Human Resources function away from Ms. Papalia (to which Ms. Papalia had no objection) and hired Donna Jordan ("Jordan") as the firm's new HR Director.  Shortly thereafter, Jordan became aware of the letter in Ms. Papalia's file concerning her treatment during jury service, and she brought the letter to Chieco's attention. (Jordan Tr. 15)[12]  Chieco subsequently discussed with Jordan the partners' intent to change Ms. Papalia's position at the firm.  (Id. at 46)  Also late in 2008, Milrose began excluding Ms. Papalia from executive-level discussions concerning the firm's finances and removed her access to payroll information.  (Papalia Tr. 247-49)  In addition, Milo's communications with Ms. Papalia became noticeably reduced; at one point, Bastone conveyed certain operations information from Milo to Ms. Papalia (rather than Milo doing so directly) and asked her whether she and Milo had had a falling out.  (Id. at 245, 250)

**G.      Age-Based Comments Made During Ms. Papalia's Demotion Evidence Discrimination**

On February 5, 2009, Chieco conducted Ms. Papalia's 2008 performance review. He started the meeting by telling Ms. Papalia that she had worked hard and done a great job.  (Id. at 253)  They also discussed the fact that Ms. Papalia still did not have a number two.  Ms. Papalia reminded Chieco that she had recently presented someone that she believed was an ideal candidate, whom he had rejected.  (Id.)  Chieco then told Ms. Papalia that he and the other partners had learned from Jordan that Ms. Papalia had written a letter concerning the treatment she faced while on grand jury duty.  Although he did not deny the facts as set forth in the letter, he expressed concern that she

---

[12] Cited pages from the transcript of the deposition of Donna Jordan are attached to the Palmieri Aff. at Exhibit C.

had written down what had happened.  Specifically, he told Ms. Papalia **"you are going to have to do something because my partners cannot get past it."**  (Id. at 256)

At the conclusion of the conversation, without warning, Chieco told Ms. Papalia that her job was being split, and that she would no longer hold the position of Executive Director of Operations.  Instead, her new position would be Director of Administration.  He handed her a piece of paper listing her new job duties, told her that her compensation would be reduced to a base salary of $170,000 and an annual bonus of $10,000, and said that she would have only one report rather than the approximately 70 that reported to her at the time.  (Id. at 258-60; Ex. AA)  Chieco also said that the responsibilities removed from Ms. Papalia would be handled by a new Director of Production, whose job description Ms. Papalia requested but never received.  (Papalia Tr. 261)

During this meeting, Chieco said that he thought Ms. Papalia would **"jump at the chance to not work so hard"** and asked **"aren't you tired?"**  (Id. at 258-59; Chieco Tr. 127)  In addition, he described for Ms. Papalia a seminar that he had recently attended full of **"young, fresh professionals,"** who he said were needed at Milrose.  (Papalia Tr. 258-59)  Chieco admits that the change to Ms. Papalia's position involved a reduction in responsibilities, and he testified that he made no effort after the February 5 meeting to convince Ms. Papalia that the Director of Administration position was a real job that the partners wanted her to accept.  (Chieco Tr. 147-48)

Milo subsequently told Ms. Papalia that, in her new position, she would no longer report directly to the partners but would instead report to a Vice President of Administration – a new position that had yet to be filled.  (Id. at 267; Milo Tr. 137)  In addition, when Ms. Papalia showed Milo the job description Chieco had given her, telling him that she believed her entire job had been

removed[13], he asked what responsibilities she had been given and laughed when he saw that they included responsibility for the mailroom. (Papalia Tr. 271)  In that conversation, as well as in a later conversation with Chieco, Ms. Papalia expressed her view that she was being discriminated against as an older woman. (Id. at 274, 291)

Milo gave Ms. Papalia multiple reasons for the decision to demote her, including that the firm was restructuring,[14] that it was due to the economy, and that her three prior number twos did not work out.  Milo also told Ms. Papalia that if she accepted the demotion, she might be the first to go in a subsequent layoff. (Id. at 287)  Ms. Papalia later learned that Bastone received a salary increase for 2009 even though Milo had told her that all salaries were frozen. (Id. at 300; Ex. S)  Bastone had previously expressed his intent to take over operations from Ms. Papalia. (Papalia Aff. ¶ 2)

Ms. Papalia was informed on February 18, 2009 that if she did not accept the new position by February 20, she would be treated as having voluntarily resigned.  Before leaving the office on February 20, Ms. Papalia advised Milrose in writing that she believed she had been constructively discharged. (Ex. BB)

**H.    Ms. Papalia Is Replaced By One Younger Man, Then Another**

In early February, Bastone advised Ken Kochiss ("Kochiss"), who is 9 years younger than Ms. Papalia, that there was an opening at Milrose for a Director of Operations (not Production).  Kochiss understood initially that he would be working with Ms. Papalia in the Director of Administration role. (Kochiss Tr. 12-13, 15-16, 58)  Kochiss spoke with Jordan about

---

[13] Chieco's testimony supports this statement; he admits that, of the identified responsibilities for the Director of Administration position, only three (Catalyst, some reporting and some space planning) were responsibilities being performed by Ms. Papalia at the time her job was "split." (Chieco Tr. 100)

[14] Milo admitted in his deposition that no reorganization took place at the time other than the split to Ms. Papalia's position. (Milo Tr. 140)  To date, Milrose has never interviewed a candidate for the Director of Administration position, much less hired one. (Jordan Tr. 82)

the position on February 24 and interviewed with Jordan and Chieco the following day.  (Ex. T)

When he spoke with Jordan, she described the position as <u>Executive</u> Director of Operations (Ms.

Papalia's title).  (Kochiss Tr. 14)  Kochiss was offered the position at a base salary of $165,000 and

a target bonus of $20,000.  (Ex. U)  There is no dispute that he replaced Ms. Papalia.  (Milo Tr. 133)

During Kochiss's tenure, the firm never interviewed for a Director of Administration and stopped

seeking to fill the position shortly after his hire.[15]  (Kochiss Tr. 37)  Kochiss subsequently hired two

number twos, but his first hire lasted only two days, and his second was terminated shortly after him

in June 2010 after approximately one month of employment.  (Jordan Tr. 89-91)

When Kochiss was let go in mid-2010, the position was filed by Bastone, who

received the title that had previously been denied to Ms. Papalia – Vice President of Operations.

(Chieco Tr. 152-53; Papalia Tr. 140)  An existing Milrose employee was given the title Manager

of Operations and functions as Bastone's number two.[16]  (<u>Id.</u> at 104)  Ms. Papalia had previously

been told by Milo that she could not fill her number two position with an existing employee but had

to hire someone new.  (Papalia Aff. ¶ 3)

**ARGUMENT**

**I.    SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S CLAIMS OF AGE AND SEX DISCRIMINATION**

   **A.    <u>Standard of Review</u>**

Summary judgment is "a drastic procedural weapon because its prophylactic

function, when exercised, cuts off a party's right to present his case to the jury."  <u>Garza v.</u>

<u>Marine Transp. Lines, Inc.,</u> 861 F.2d 23, 26 (2d Cir. 1988) (citation omitted).  Thus, the moving

party has the burden of showing the absence of a genuine issue as to any material fact, and the

---

[15] Jordan similarly testified that she has never interviewed anyone for the Director of Administration position, and that Milrose is currently doing nothing to fill that position.  (Jordan Tr. 82, 118)

[16] According to Chieco, neither Kochiss nor Bastone had a number two. (Chieco Tr. 178)

11

court must view the evidence in the light most favorable to the non-moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598 (1970); <u>Garza</u>, 861 F.2d at 26. "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." <u>Gallo v. Prudential Residential Servs., Ltd.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994). Accordingly, "if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 101 (2d Cir. 2001) (citation omitted).

The Second Circuit has recognized that when deciding whether the "drastic provisional remedy" of summary judgment should be granted in a discrimination case, additional considerations come into play. "Courts should use summary judgment sparingly in discrimination cases because juries have 'special advantages' over judges in assessing individuals' motivations and state of mind." <u>Brown v. Henderson</u>, 257 F.3d 246, 251 (2d Cir. 2001); <u>see also</u> <u>Daly v. Presbyterian Hospital</u>, No. 98 Civ. 4253 (NRB), 2000 WL 8268, at *2 (S.D.N.Y. Jan. 4, 2000) ("In considering this summary judgment motion, we are mindful that summary judgment is 'ordinarily inappropriate' in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision." (citing <u>Patrick v. LeFevre</u>, 745 F.2d 153, 159 (2d Cir. 1984)). In a discrimination case, when "evidence has been marshaled which supports both parties' assertions, deciding which story to believe is the unique province of a jury." <u>Ames v. Cartier, Inc.</u>, 193 F. Supp 2d 762, 773 (S.D.N.Y. 2002). Since employers "are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly

forbidden by law" (Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir. 1999)), an "extra measure of caution is merited" when reviewing a summary judgment motion in a discrimination action because "intent must be inferred from circumstantial evidence." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001); see also Gallo, 22 F.3d at 1224 ("Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."). A motion for summary judgment thus "may be defeated where 'a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" Byrnie, 243 F.3d at 102 (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2109 (2000)).

Milrose has failed to satisfy the applicable standard on a motion for summary judgment. Because numerous disputed issues of fact remain to be resolved by a jury, Milrose's motion for summary judgment must be denied.

**B.   Ms. Papalia Has Established a *Prima Facie* Case of Discrimination**

To establish a *prima facie* case of discrimination, a plaintiff must show (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the action give rise to an inference of discrimination. Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009). Milrose does not dispute, nor can it, that Ms. Papalia has established the first three elements of a *prima facie* case.

Direct evidence of discrimination is not necessary to satisfy the fourth element of a *prima facie* case. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence. Carlton v. Mystic Transportation, Inc., 202 F. 3d 129, 135

(2d Cir. 2000). The burden of proof at the *prima facie* stage is *de minimus*. Dister v. Cont'l Group, Inc., 859 F.2d 1008, 1115 (2d Cir. 1988).

Ms. Papalia does not need to show that other women at Milrose – older or otherwise – were treated unfavorably in order to raise an inference of discrimination. "In determining whether an employee has been discriminated against 'because of such individual's ... sex,' the courts have consistently emphasized that the ultimate issue is the reasons for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace. As a result, discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex." Back v. Hastings, 365 F.3d 107, 121 (S.D.N.Y. 2004) (emphasis in original) (citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (citations omitted)). Along the same lines, Ms. Papalia can raise an inference of discrimination without demonstrating that she was treated less favorably than similarly-situated younger male employees. "[A] showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to discharge that burden." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir.), cert. denied, 122 S. Ct. 460 (2001).

In this case, the replacement of Ms. Papalia by first one, then another, younger male employee, as well as a series of sex- and age-based comments by the decisionmakers, give rise to an inference of discrimination.

### 1.   Ms. Papalia was replaced by younger men

One reliable indicator of discrimination is the fact that Ms. Papalia was replaced by younger men. "[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title

VII analysis." <u>Zimmermann v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 381 (2d Cir. 2001);

<u>see</u> <u>also</u> <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000) (discrimination can

be inferred from evidence that the decision-maker showed a "preference for a person not of the

protected class"); <u>Carlton</u>, 202 F.3d at 135-36 (*prima facie* case established where the 57-year

old plaintiff's duties were transferred to existing employees 18 and 25 years younger).   Ms.

Papalia's replacements – first Ken Kochiss and then Joseph Bastone – are men who are 9 and 8

years younger than her, respectively.   Although they are each over 40, the fact that they are

significantly younger than Ms. Papalia permits an inference of discrimination on the basis of age.

<u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 312, 116 S. Ct 1307, 1310 (1996)

("The fact that one person in the protected class has lost out to another person in the protected

class is thus irrelevant, so long as [s]he has lost out *because of [her] age*.")

> **2.    Statements made by Milo and Chieco created a discriminatory atmosphere from which a reasonable juror may conclude that Ms. Papalia suffered illegal discrimination**

Milo's and Chieco's sex- and age-based comments are admissible evidence that

their decisions concerning Ms. Papalia's employment were motivated by discriminatory animus.

<u>See</u> <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 251 (1989) (although "[r]emarks at work that

are based on sex stereotypes do not inevitably prove that gender played a part in a particular

employment decision, … stereotyped remarks can certainly be evidence that gender played a

part"); <u>Heyne v. Caruso</u>, 69 F.3d 1475, 1479 (9th Cir. 1995) ("it is clear that an employer's

conduct tending to demonstrate hostility towards a certain group is both relevant and admissible

where the employer's general hostility towards that group is the true reason behind firing an

employee who is a member of that group"); <u>Phillip v. ANR Freight Sys., Inc.</u>, 945 F.2d 1054 (8th

Cir. 1991) ("background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive").

Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and the adverse employment action.  In determining whether a comment is a probative statement that evidences an intent to discriminate, a court should consider the following factors: (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.  Schreiber v. Worldco, LLC, 324 F. Supp.2d 512, 519 (S.D.N.Y. 2004).  A comment "may bear a more ominous significance when considered within the totality of the evidence."  Carlton, 202 F.3d at 136 (supervisor suggested that plaintiff "retire" during a meeting discussing his termination).

Defendant does not dispute that Milo and Chieco are decisionmakers but instead argues that most of the comments at issue are unrelated to the decision to demote Ms. Papalia. Viewed collectively, however, Milo's and Chieco's remarks concerning age and sex reflect a discriminatory atmosphere at Milrose and, consequently, constitute evidence of discrimination for a jury to evaluate.  See Schreiber, 324 F. Supp.2d at 522 (citing Conway v. Electro Switch Corp., 825 F.2d 593, 397 (1st Cir. 1987) (evidence of discriminatory atmosphere may be relevant because it tends to add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.")); see also Warren v. Halstead Indus., Inc., 802 F.2d 746, 753 (4th Cir. 1986) (holding that evidence of a general atmosphere of discrimination, harassment, or threats is relevant to the determinations of intent and pretext).

In addition, the context in which the statements were made dictates that they cannot be considered "stray."  When the President of Milrose instructs an employee not to hire any more women in key positions (which would include Ms. Papalia's position), he sets forth the firm's official stance on hiring women.  When Milo similarly provides in a policy paper certain age and gender criteria for a new hire, he evidences the firm's policy of basing employment decisions on those criteria.   Assuming the intent of the directive was (as Chieco testified) to maintain Milrose's client base, employers "may not discriminate on the basis of their customers' preferences." Ames v. Cartier, Inc., 193 F. Supp.2d 762, 769 (S.D.N.Y. 2002) (citing Wigginess Inc. v. Fruchtman, 482 F. Supp. 681, 692 (S.D.N.Y. 1979), aff'd 628 F.2d 1346 (2d Cir.1980). In Ames, the court held that "[e]vidence of such a policy constitutes sufficient direct evidence to support plaintiff's mixed-motive claim." Id.  Moreover, at least one of Milo's comments was directed specifically at Ms. Papalia, in which he expressed his surprise that an older woman such as she would continue to pursue a career at Milrose rather than find "a little job out on Long Island."  As for Chieco's comment that Human Resources is "a woman's job," that comment relates to Ms. Papalia in that she was responsible for Human Resources until mid-2008, shortly before her demotion.

Three of the comments at issue – all concerning age – were made while informing Ms. Papalia of her demotion and thus clearly relate to that process.  Chieco admittedly told Ms. Papalia that he thought she would be happy to work less hard.  (Chieco Tr. 127)  Chieco also told Ms. Papalia that the firm needed "young, fresh professionals"[17] and asked Ms. Papalia "aren't you tired?"  (Papalia Tr. 258-59)  A reasonable juror could readily find that these remarks concerned Ms. Papalia's age and demonstrate evidence of discriminatory motivation.

---

[17] Chieco testified that he instead said "new, fresh ideas" – another question of fact to be decided by the jury. (Chieco Tr. 126)

Finally, the fact that Milo is approximately the same age as Ms. Papalia does not undermine her *prima facie* case of age discrimination. "The proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." Danzer v. Norden Sys., Inc., 151 F.3d 50, 55 (2d Cir. 1998).

### C.   A Question of Fact Exists As to Whether the Stated Basis for Ms. Papalia's Demotion Was Pretextual

Once a defendant articulates a non-discriminatory reason for its action, the plaintiff may satisfy her burden of demonstrating that she was a victim of discrimination by showing that the employer's business reasons for the challenged conduct are pretextual.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).  Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Dister, 859 F.2d at 1113 (quoting Burdine, 450 U.S. at 256).

Pretext may constitute "powerful evidence of discrimination."  Stratton v. Department for the Aging for N.Y., 132 F.3d 869, 879 (2d Cir. 1997); Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d Cir. 1995) ("Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct.").  Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Dister, 859 F.2d at 1113.  At the summary judgment stage, Ms. Papalia need not prove pretext, but need show only that triable issues of material fact exist as to whether Milrose's reasons for demoting her were false or pretextual.  Id. at 1115; see also Gordon v. N.Y.C. Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000)

("[A] plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.") (internal citations omitted).

Milrose asserts that Ms. Papalia was demoted because her efforts to hire a number two had been unsuccessful, and, as a result, the firm decided that it would instead split her responsibilities into two positions, each of which the firm needed to fill. Material questions of fact exist as to the validity of this assertion.

First, Milrose's justifications for Ms. Papalia's demotion may be viewed as pretextual because they rely on the partners' subjective evaluation of the effort Ms. Papalia was giving to the search for a number two. "In employment discrimination cases, courts must give particular scrutiny to 'subjective evaluation[s],' because (1) 'any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case' and (2) a discriminatory consideration such as age could play into the 'formation of subjective impressions.'" Weiss v. JPMorgan Chase & Co., No. 08-0801-cv, 2009 WL 1585279, at *2 (2d Cir. Jun. 5, 2009) (citing Byrnie 243 F.3d at 107-08 (2d C. 2001)). Three people were in fact hired to fill the role of Ms. Papalia's number two. The last of those people was recommended by Milo himself for the position. When it was clear that she was not going to work out, Ms. Papalia made plans to work with the new HR Director (who had yet to be hired) to once again redraft the job description and screen possible candidates, as she had done with prior HR Directors (and as Milrose's partners admittedly expected her to do). (Papalia Tr. 112, 244; Chieco Tr. 68-69; Milo Tr. 87)  Jordan testified that she interviewed six or seven people for the position in the last quarter of 2008, but only two of those people were qualified enough for Ms. Papalia to interview. (Jordan Tr. 37)  Earlier in the year, Ms. Papalia recommended a candidate to Chieco, who rejected that candidate. (Papalia Tr. 225)

19

Second, Milrose's "split" of Ms. Papalia's responsibilities was not a legitimate split, in that the responsibilities assigned to Ms. Papalia as Director of Administration were not key tasks. One such responsibility – the development of Milrose University – was clearly unimportant in that it remained a mere concept through the entire tenure of Ms. Papalia's successor.  (Kochiss Tr. 63)[18] Others – like the Catalyst software program, which was scheduled to launch at the end of May (Chieco Tr. 205) – were intended to be short-lived.  Chieco testified, moreover, that no one at Milrose is currently responsible for either facilities management or space planning – two of the tasks assigned to Ms. Papalia as Director of Administration; instead, "[i]t is whoever has the ability to do it, we grab it and do it."  (Chieco Tr. 117)  If it were important to Milrose to have someone in charge of those responsibilities, as asserted in connection with Ms. Papalia's demotion, then the firm would certainly have put someone else in charge by now.

Third, Milrose failed to proceed with the job split following Ms. Papalia's constructive discharge.   Instead, when Ms. Papalia rejected her demotion to Director of Administration, the firm hired Kochiss as Director of Operations (not Production).  The evidence is clear that Kochiss assumed all of the responsibilities Ms. Papalia performed prior to her demotion. (Kochiss Tr. 29; Milo Tr. 133)  Subsequently, Bastone assumed the position of Vice President of Operations, again performing all of the responsibilities previously handled by Ms. Papalia.  (Chieco Tr. 152-53)   To date, Milrose has neither hired nor interviewed for a Director of Administration. (Jordan Tr. 82)

A plaintiff's *prima facie* case, "combined with sufficient evidence for a reasonable factfinder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination…."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct 2097 (2000)  "Since discrimination plaintiffs rarely have

---

[18] Cited pages of the transcript of the deposition of Ken Kochiss are attached to the Palmieri Aff. as Exhibit E.

direct evidence of discriminatory animus ... they often 'must defeat summary judgment on the strength of [their] *prima facie* case combined with circumstantial evidence that [the] stated reason for [the adverse employment action] is pretext.'" Evans v. Port Authority of New York and New Jersey, 192 F. Supp.2d 247, 266 (S.D.N.Y. 2002) (citing Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001)).  Here, the evidence used to establish Ms. Papalia's *prima facie* case – including the sex- and age-based comments of the decisionmakers – combined with evidence of pretext, preclude the granting of summary judgment to Milrose on Ms. Papalia's discrimination claims.

## II.   SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S CLAIM UNDER THE JSIA

Similarly, a question of material fact exists as to whether Ms. Papalia suffered an adverse employment action as a result of her jury service.  The evidence demonstrates that in late 2007, shortly after the conclusion of her jury service, Ms. Papalia's bonus eligibility percentage was cut in half, from 0.25 percent to 0.125 percent of project management revenue.  When Ms. Papalia questioned the reduction, Milo said "I don't know why we're still giving you that."[19] (Papalia Tr. 195)  And although Ms. Papalia's request to have her base salary brought in line with that of new hire Bastone was granted during her jury service, Bastone received greater commutation benefits than did Ms. Papalia, as well as a life insurance policy that was denied to her.  (Id. at 202) A reasonable juror could thus conclude that Ms. Papalia's production bonus was reduced because of her jury service, based on both temporal proximity and the hostile environment she faced as a result of that service.

As for Ms. Papalia's demotion, although her jury service had ended over a year earlier, Milrose's partners had just learned that she had written a letter concerning the hostile

---

[19] Chieco explained that the firm was "banding" directors (Id. at 197); however, Ms. Papalia was an executive director, not a director.

treatment she suffered during that service.  Although Chieco testified that he felt betrayed by the fact that Ms. Papalia wrote the letter and put it in her file, this reaction is disingenuous given that Chieco did not dispute the accuracy of the letter.  (Papalia Tr. 256)  Moreover, when he told Ms. Papalia during her demotion that "my partners cannot get past it," Chieco appears to be referring not to himself but to Milo, who was primarily responsible for the hostility directed at Ms. Papalia during her actual jury service.

The JSIA was enacted "because some employers are hostile to the idea of their employees serving as jurors and threaten, harass or even discharge those who accept jury duty." Shea v. County of Rockland, 810 F.2d 27, 27 (2d Cir. 1987).  "The statute is designed to protect the juror from any employer who is 'hostile to the idea of jury duty, or who believes that the interests of his business outweigh the obligation for jury service imposed by law.'"  Jeffreys v. My Friend's Place, Inc., 719 F. Supp. 639, 644-45 (M.D. Tenn. 1989) (citing H.R.Rep. No. 1652, 95th Cong., 1st Sess. 7).  The evidence supports the conclusion that Milo harassed Ms. Papalia over her jury service in violation of the JSIA, and by making her feel like she was taking advantage of the company, demonstrated his belief that the interests of Milrose outweighed Ms. Papalia's obligation to serve.

During her jury service, Ms. Papalia expressed to the partners her disappointment at the anger they were directing toward her, and asked them to stop.  At the same time, she attempted to allay Milo's misplaced concern that she was not performing her job, all to no avail.  (Papalia Tr. 118, 151)  Then, shortly after learning that Ms. Papalia had documented her complaints of jury service harassment, Milo stopped communicating with her and participated with Chieco in the decision to demote her.  These facts permit a reasonable juror to conclude that Ms. Papalia's jury service was the "but for" cause of her demotion.  The purpose of the JSIA would be defeated if employees not terminated during their actual jury service could subsequently be terminated for

having documented a complaint concerning harassment during jury service – harassment that itself violated the JSIA.

## CONCLUSION

For all of the foregoing reasons, plaintiff respectfully requests that defendant's summary judgment motion be denied and plaintiff be afforded the opportunity to have her claims tried before a jury of her peers.

Dated: New York, New York
         May 12, 2011

                                    LIDDLE & ROBINSON, L.L.P.


                                    By: _____
                                         Christine A. Palmieri
                                         Jennifer Rodriguez
                                    Attorneys for Plaintiff
                                    800 Third Avenue
                                    New York, New York 10022
                                    (212) 687-8500